UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 21-163 (JDB) |
| OLATUNJI DAWODU & ALEX OGANDO, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Defendant Alex Ogando is charged by indictment with conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 846.  Indictment [ECF No. 3] at 2–6.  Ogando was ordered detained pending trial by Magistrate Judge G. Michael Harvey on April 8, 2021, and he now moves for revocation of that detention order pursuant to 18 U.S.C. § 3145(b).  For the reasons set forth below, the Court will deny Ogando's motion.

## Background

Between March 2019 and February 2021, defendant Alex Ogando participated in a conspiracy to sell counterfeit oxycodone pills containing fentanyl.  E.g., Indictment ¶¶ 5, 8–10; Gov't's Opp'n to Def.'s Mot. for Recons. of Pretrial Det. Order [ECF No. 17] ("Gov't Opp'n") at 4–5, 7.[1]  Over the course of this conspiracy, Ogando engaged in over 7,700 transactions, selling more than 214,000 fentanyl-laced pills in exchange for nearly two million dollars.  Gov't Opp'n at 6–7.  The fundamental structure of this enterprise was simple—drugs for money—but Ogando utilized a sophisticated mix of newfangled and old-fashioned technologies to carry out the scheme.

---

[1] The following factual summary is based on the Indictment and the evidence proffered by the government in its opposition, see Gov't Opp'n at 1–2, 4–15.

On the one hand, Ogando used "darknet"[2] markets to advertise and sell the pills under the moniker "PolarSprings," Indictment ¶¶ 7, 10(a); Gov't Opp'n at 4–6; he communicated with prospective buyers using encrypted messages, Indictment ¶ 10(b); Gov't Opp'n at 6 & n.3, 12; and he took payment primarily in difficult-to-trace cryptocurrencies like Bitcoin, Indictment ¶¶ 7, 10(g).  See generally Indictment ¶¶ 1–3 (explaining cryptocurrency and the darknet, including how they hide the user's identity and activities).  Upon receiving an order, Ogando and other conspirators would package the pills in a padded manila envelope and deliver them to the buyer using a centuries-old service: curbside drop boxes from the U.S. Postal Service.  Indictment ¶¶ 10(d), 19–21.

Following a twenty-month-long investigation, Gov't Opp'n at 4, federal agents arrested Ogando in Rhode Island on February 23, 2021, id. at 2 n.1.  On the same day, agents also executed a search warrant at Ogando's residence, recovering significant quantities of drugs, money, and digital evidence connecting him to the operation.  Id. at 9–10.  Ogando was subsequently transferred to this District, and on April 8, 2021, Magistrate Judge G. Michael Harvey held a detention hearing.  See Min. Entry, Apr. 8, 2021.  Judge Harvey granted the government's motion to detain Ogando pending trial, concluding that he presented a sufficient threat to the safety of the community and risk of flight to necessitate pretrial detention under 18 U.S.C. § 3142.  Order of Detention Pending Trial [ECF No. 8] ("Det. Order") at 3–4.

Almost eleven months later, Ogando filed the instant motion asking this Court to revoke Judge Harvey's detention order.  See generally Def.'s Mot. for Recons. of Pretrial Det. Order and Req. for Hr'g [ECF No. 15] ("Def.'s Mot.").  In lieu of continued detention, Ogando asks the Court

---

[2] As defined in the Indictment, a "darknet market" is a "commercial website[] located within the Tor network's hidden services that c[an] only be accessed using Tor."  Indictment ¶ 2.  "Tor" is, roughly, a computer program and web browser that "prevents websites and other services from learning your location," "prevents people watching your traffic locally . . . from learning what information you're fetching," and hides the user's individual IP address.  About Tor, The Tor Project (last visited May 16, 2022), https://support.torproject.org/about/.

to release him to the custody of his fiancée in Rhode Island and place him on heightened supervision ("HISP"). <u>Id.</u> at 4–5.[3]  The government timely filed its opposition on March 16, 2022, reiterating many of the arguments it made to Judge Harvey and outlining additional evidence against Ogando uncovered in the intervening eleven months.  <u>See generally</u> Gov't Opp'n.  Ogando did not file a reply brief, and the Court determined that no formal hearing was necessary to the disposition of the motion,[4] though the parties briefly addressed the issues at a status conference on May 5, 2022.  The motion is therefore ripe for decision.[5]

### <u>Legal Standard</u>

Federal law authorizes detention of a defendant pending trial, but only in certain, limited circumstances.  <u>See</u> 18 U.S.C. §§ 3141–3156; <u>see also</u> <u>United States v. Klein</u>, 533 F. Supp. 3d 1, 7 (D.D.C. 2021) ("Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." (quoting <u>United States v. Singleton</u>, 182 F.3d 7, 13 (D.C. Cir. 1999))).  A defendant is eligible for pre-trial detention if his case "involves" one of several enumerated crimes, 18 U.S.C. § 3142(f)(1), or a "serious risk that [the defendant] will flee" or obstruct justice if not detained, <u>id.</u>

---

[3] Ogando's motion also included a request in the alternative that the Court transfer him from D.C. to a jail in Rhode Island.  <u>See</u> Def.'s Mot. at 5.  At the status conference in this matter on May 5, 2022, however, Ogando orally withdrew this request.

[4] Although an <u>initial</u> decision to detain a defendant pending trial must follow a hearing, <u>see</u> 18 U.S.C. § 3142(e)(1), "there is no statutory requirement that the court hold a hearing" on a motion for revocation under § 3145(b), <u>United States v. Oaks</u>, 793 F. App'x 744, 747 (10th Cir. 2019) (per curiam) (citing <u>United States v. Cisneros</u>, 328 F.3d 610, 617 (10th Cir. 2003)); <u>accord, e.g.</u>, <u>United States v. Swanson</u>, Case No. 1:21-CR-834, 2022 WL 684198, at *3 (N.D. Ohio Mar. 7, 2022) (collecting cases).  Instead, "[t]he district court has discretion in determining whether to conduct a supplementary evidentiary hearing as part of its de novo review [of a detention order]."  <u>United States v. Hensler</u>, No. 94-50042, 1994 WL 83436, at *2 (5th Cir. Feb. 24, 1994) (per curiam); <u>accord</u> <u>Oaks</u>, 793 F. App'x at 747.  Given the record before the Court in this case, the Court deems such a hearing unnecessary and will exercise its discretion not to hold one.

[5] The Court is cognizant of the statutory command that revocation motions "shall be determined promptly." 18 U.S.C. § 3145(b).  The Court delayed its decision of this motion due to indications that this matter was likely to terminate via plea agreement before a decision could be rendered.  Upon learning that plea negotiations remain ongoing, however, the Court immediately directed its attention to Ogando's motion in order to resolve it promptly.

§ 3142(f)(2).  A qualifying defendant must be detained pending trial "[i]f . . . the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  Id. § 3142(e)(1).  In short, "the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'"  United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019).  When making this determination, the court "shall . . . take into account the available information concerning" four specified factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).

The government bears the burden to justify pre-trial detention: it must "demonstrate that the defendant is a flight risk . . . by a preponderance of the evidence, or that he poses a danger to the community by clear and convincing evidence."  United States v. Ali, 793 F. Supp. 2d 386, 387 (D.D.C. 2011); accord, e.g., United States v. Munchel, 991 F.3d 1273, 1279–80 (D.C. Cir. 2021) (burden with respect to dangerousness); Vasquez-Benitez, 919 F.3d at 551 (burden with respect to flight risk).  However, if there is probable cause to believe that the defendant committed "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," 18 U.S.C. § 3142(e)(3)(A), then, "[s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," id. § 3142(e)(3).  See also United States v. Muschetta, 118 F. Supp. 3d 340, 344 (D.D.C. 2015) ("[T]he Court 'may rely on a grand jury indictment to establish probable cause for the purposes of triggering the rebuttable presumption of section 3142(e).'" (quoting United States v. Williams, No. 90-3070, 1990 WL

73191, at *1 (D.C. Cir. June 4, 1990) (per curiam))).  This presumption does not force "the [defendant] to carry the Government's burden of proof or persuasion," but it does "operate[] <u>at a minimum</u> to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption."  <u>United States v. Alatishe</u>, 768 F.2d 364, 371 (D.C. Cir. 1985).  Even if he does so, however, "the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained."  <u>Ali</u>, 793 F. Supp. 2d at 388; <u>accord</u> <u>United States v. Hunt</u>, 240 F. Supp. 3d 128, 132 (D.D.C. 2017); <u>United States v. Stone</u>, 608 F.3d 939, 945 (6th Cir. 2010) ("The presumption remains as a factor because it . . . . reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.").

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment of the order" with "the court having original jurisdiction over the offense."  18 U.S.C. § 3145(b).  The D.C. Circuit has not directly decided what standard governs a district court's review of a magistrate judge's detention order, <u>see</u> <u>Munchel</u>, 991 F.3d at 1280 & n.3, but courts in this District have uniformly held that the district court reviews the order <u>de novo</u>, <u>e.g.</u>, <u>United States v. Languerand</u>, Case No. 21-cr-353 (JDB), 2021 WL 3674731, at *4 (D.D.C. Aug. 19, 2021); <u>Hunt</u>, 240 F. Supp. 3d at 132–33 (collecting out-of-circuit cases adopting this rule).

## <u>Analysis</u>

It is not disputed that Ogando is both eligible for pre-trial detention and subject to a rebuttable presumption favoring detention, as he has been indicted by a grand jury for "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled

Substances Act."[6]  See 18 U.S.C. § 3142(e)(3)(A), (f)(1)(C).  At the outset, it is far from clear that

Ogando has rebutted the statutory presumption favoring pre-trial detention: his motion contains

two paragraphs of argument and consists primarily of conclusory statements.  See Def.'s Mot. at

4–5.  But the Court need not make a finding with respect to rebuttal in this case: even if Ogando

has rebutted the presumption, the Court still concludes, as Judge Harvey did, that the government

has carried its burden of persuasion regarding the necessity of pre-trial detention.  The Court will

deny Ogando's motion for revocation.

## I.    Nature and Circumstances of the Offense

It is uncontested—and uncontestable—that Ogando is charged with a very serious crime

presenting substantial danger to the community.  Over the course of two years, Ogando allegedly

distributed more than 26 kilograms of opioids containing fentanyl in thousands of separate

transactions, all while using sophisticated techniques to avoid detection.  E.g., Gov't Opp'n at 7.

The charged offense not only "involves . . . a controlled substance," 18 U.S.C. § 3142(g)(1)—it is

also a Class A felony, carries a mandatory minimum sentence of ten years, and, as noted above, is

subject to a rebuttable presumption in favor of pre-trial detention, see Munchel, 991 F.3d at 1286

(Katsas, J., concurring in part and dissenting in part) (indicating that these three considerations are

relevant under this factor).  Nor was this a one-off incident plausibly attributable to a temporary

lapse of judgment.  Ogando is alleged to have played a major role in a long-running drug

distribution operation requiring detailed planning and coordination.  E.g., Indictment ¶ 10; Gov't

---

[6] Specifically, Ogando is charged with violating 21 U.S.C. § 846, which prohibits "conspir[ing] to commit any offense defined in [Title 21, Chapter 13, subchapter 1 of the U.S. Code]" and provides that such conspiracy shall be punished according to "the same penalties as those prescribed for the [underlying] offense."  In this case, that underlying offense—enacted along with § 846 in the Controlled Substances Act, Pub. L. No. 91-513, Title II, §§ 401, 406, 84 Stat. 1242, 1260, 1265 (1970)—is the distribution of 400 grams or more of fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vi), which is subject to a mandatory minimum sentence of ten years and a maximum sentence of life imprisonment.  See 18 U.S.C. § 841(b)(1)(A).

Opp'n at 5–7.  These considerations suggest that Ogando is likely to resume such conduct if released and, even more concerningly, that he has the expertise and resources to do so undetected.

Moreover, the drugs Ogando allegedly shipped across the country are, as Judge Harvey noted, "some of the most addictive and dangerous available."  Det. Order at 3; accord, e.g., Fentanyl Facts, Nat'l Ctr. for Injury Prevention and Control, CDC (last reviewed Feb. 23, 2022), https://www.cdc.gov/stopoverdose/fentanyl ("Fentanyl is a synthetic opioid that is up to 50 times stronger than heroin and 100 times stronger than morphine. It is a major contributor to fatal and nonfatal overdoses in the U.S.").  Synthetic opioids (excluding methadone)—of which fentanyl is the most common variant—were responsible for 56,516 overdose deaths in 2020, more than 61% of all overdose deaths reported that year, Overdose Death Rates, National Institute on Drug Abuse, National Institutes of Health (Jan. 20, 2022), https://nida.nih.gov/drug-topics/trends-statistics/overdose-death-rates (reporting 91,799 total drug overdose deaths), and preliminary federal data puts that number at more than 70,000 for 2021, Provisional Drug Overdose Death Counts, National Center for Health Statistics (May 11, 2022), https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.  If Ogando resumed his prior criminal conduct on release, the further spread of fentanyl would pose a serious threat to the public.

Ogando does not directly minimize the seriousness of the charges against him, but he does note that "the government has not alleged that [he] was involved in any violent act or the possession of any firearms in connection with the purported conspiracy."  Def.'s Mot. at 3.  This is true, and the fact that Ogando is not accused of violent criminal conduct either before or during this conspiracy is indeed a point weighing modestly in his favor.  But only modestly: in the Court's view, the lack of violent conduct only marginally undermines the seriousness of Ogando's offense, and it does not mitigate the Court's concerns regarding Ogando's demonstrated ability and

willingness to engage in a lucrative and harmful criminal conspiracy.  Even accounting for the fact that Ogando is not alleged to have committed any acts of violence or to have possessed firearms, the nature and circumstances of the alleged offense in this case weigh strongly in favor of pre-trial detention.

## II.     Weight of the Evidence

The weight of the government's evidence against Ogando also favors pre-trial detention. This prosecution centers on a darknet fentanyl vendor operating under the moniker "PolarSprings" and generally operates on a syllogism: PolarSprings was dealing fentanyl; Ogando was behind PolarSprings; therefore, Ogando was dealing fentanyl.  First, it is clear from the government's proffered evidence that PolarSprings was engaged in large-scale distribution of fentanyl.  Federal agents made at least five undercover purchases of pills from the vendor between June 2019 and December 2020; each order was packaged in a similar manner, and every shipment tested positive for fentanyl.  Indictment ¶¶ 13–15; Gov't Opp'n at 8–9.  More generally, relying on information recovered from darknet market servers seized by law enforcement and "sales and review information posted to the other [darknet] markets [involved]," the government has pieced together a catalog of PolarSprings's (extensive) transaction history between March 2019 and February 2021.  Gov't Opp'n at 6–7.  Finally, the government can show that the same user or group of users was behind PolarSprings for that entire time: in addition to using the same moniker, each PolarSprings account used the same "PGP public key," a unique piece of information used when encrypting messages and also frequently used as a means of identity authentication on the darknet. See Gov't Opp'n at 6 & n.3.

Next, the government has put forward strong evidence that Ogando was behind PolarSprings.  A Bitcoin trader known to have provided funds to PolarSprings identified a photo of Ogando as the person he dealt with, and the trader also provided law enforcement with his

communication history with Ogando.  Gov't Opp'n at 7–8.  The government also proffers incriminating text messages and WhatsApp communications between Ogando and his co-defendant, Olatunji Dawodu, discussing the drug distribution operation, including arranging shipments of drugs with an individual known to have handled packages for PolarSprings, Gov't Opp'n at 14–15, and referencing specific orders for pills placed with PolarSprings, id. at 14.

Furthermore, law enforcement recovered substantial evidence from Ogando's residence connecting him to the PolarSprings operation.  On a piece of paper under the heading "P.Springs," investigators found the password to the private encryption key used by PolarSprings, while a different note included the password to a cryptocurrency wallet containing addresses used by PolarSprings.  Gov't Opp'n at 12.  Similarly, law enforcement found papers recording "seed phrases"—lists of words unique to a given Bitcoin wallet which are used to recover funds in the event of a technological malfunction—connected to wallets that received more than 20 payments from a repeat customer of PolarSprings, strongly suggesting that payments made to PolarSprings went to Ogando.  See id. at 11, 14.  Finally, a cellphone found at Ogando's residence held a cryptocurrency wallet used by PolarSprings and contained communications arranging drop-offs of PolarSprings shipments.  Id. at 9, 12.  Agents also recovered various physical items supporting Ogando's involvement in the operation, including approximately $370,000 in cash, a money counter, approximately 1.7 kilograms of pills containing fentanyl, and 30 USPS envelopes containing around 200 grams of fentanyl pills packaged in a manner consistent with those previously purchased form PolarSprings.  Indictment ¶ 21; Gov't Opp'n at 9–10.  In sum, the government's evidence that Ogando was one of the individuals behind the PolarSprings moniker is very strong.

Before Judge Harvey, Ogando challenged the strength of the case against him, arguing that the government is relying on a witness who "is likely an individual in legal jeopardy who has an incentive to tie [Ogando] to the operation" and emphasizing the circumstantial nature of the evidence. See Det. Order at 3 (relating Ogando's arguments for release). At the outset, even if the evidence against Ogando is circumstantial, pre-trial detention is not limited to cases in which the government presents direct evidence of guilt. See United States v. Harmon, No. 21-3067, 2021 WL 6102456, at *1 (D.C. Cir. Dec. 20, 2021) (affirming detention order resting on circumstantial evidence and noting that, "[a]s a general rule, circumstantial evidence is as pertinent as direct evidence to the establishment of guilt or innocence in a criminal case." (quoting United States v. Gates, 807 F.2d 1075,1080 (D.C. Cir. 1986))). Moreover, now that investigators have had time to process the evidence recovered from Ogando's residence (i.e., the passwords, seed phrases, and cell phone data), there is substantially more evidence connecting Ogando to PolarSprings than there was in April 2021 (when, it bears mentioning, Judge Harvey still concluded that the government's evidence weighed in favor of detention, see Det. Order at 3). See Gov't Opp'n at 15 ("The government's case has only strengthened since the detention hearing: there is direct evidence on digital devices that connect the defendant to the operation of the PolarSprings moniker . . . . [and] numerous hard copy records . . . link him to the moniker . . . ."). The Court thus concludes that the weight of the evidence supporting Ogando's involvement in the PolarSprings conspiracy favors his pre-trial detention.

## III.   History and Characteristics of the Defendant

The third consideration in weighing pre-trial detention is the defendant's "history and characteristics," including his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history

relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).  Ogando does not explicitly rely on this factor in arguing for release, but Judge Harvey found that it weighed against pretrial detention.  Det. Order at 4.  In particular, Judge Harvey noted that "[Ogando] is a lifelong resident of Rhode Island, has family in the area, lives with his girlfriend, and is currently employed" and that he "has no prior criminal history."  Id.

This Court has no evidence either way regarding Ogando's employment, his history in Rhode Island, or the residences of his family members—trusting the factfinding of Judge Harvey, the Court will assume that these facts remain true (even if fifteen months of incarceration on federal drug charges is likely to imperil any offers of employment).  Nonetheless, the Court sees this factor as neutral at best.  To be sure, a history of connection to a community and the presence of family members cuts somewhat against Ogando's likelihood of flight.  But they do little to help assure the safety of the community.  As the government notes, "th[e]se very same factors were in place at the time that the multi-year drug trafficking operation was being run out of the defendant's residence."  Gov't Opp'n at 15.  Moreover, the fact that Ogando lived with his fiancée—whom he now proffers as a third-party custodian—prior to his arrest is a source of concern rather than comfort for the Court: it was while Ogando was living with his then-girlfriend that he engaged in the criminal conduct at issue here.  See Gov't Opp'n at 16; Det. Order at 3.  Releasing Ogando to Rhode Island to live with his fiancée would represent a return to the same environment in which Ogando successfully dealt fentanyl undetected for at least two years.  The Court struggles to count residence history of this type in Ogando's favor.

## IV.    The Nature and Seriousness of the Danger Posed by Release

Finally, the Court considers "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g)(4).  The Court will

also consider the nature and seriousness of the risk that Ogando will flee from prosecution if released.  "Because this factor substantially overlaps with the ultimate question whether any conditions of release will reasonably assure the safety of any other person and the community, it bears heavily on the Court's analysis."  Languerand, 2021 WL 3674731, at *10 (cleaned up) (quoting United States v. Cua, Crim. A. No. 21-107 (RDM), 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021)).  For many of the reasons outlined above, the Court concludes that releasing Ogando carries a substantial risk of serious harm to the public and a strong likelihood that he might attempt to evade the jurisdiction of the Court.

The Court has already explained the magnitude of the danger posed by the distribution of fentanyl, particularly when conducted on the scale of Ogando's PolarSprings operation. Heightening the Court's concern is Ogando's expertise with technologies—including encrypted messaging, cryptocurrencies, and the darknet—that can hinder law enforcement's ability to detect illegal activity.  He is, as Judge Harvey noted, "charged as a member of a sophisticated and longstanding narcotics operation . . . [whose] members are practiced in eluding law enforcement and have access to virtual currency and large amounts of cash." Det. Order at 4.  As a consequence, should he seek to resume the dangerous conduct for which he has been indicted, Ogando would know how to do so surreptitiously.  See Gov't Opp'n at 16 ("[G]iven the sophisticated means of the drug trafficking in this case—involving darknet markets and encrypted messaging applications—there would be no way to ensure that the defendant could not resume this conduct using software that by its very nature is designed to evade detection of law enforcement.").  And although Ogando's counsel noted at the May 5 status conference that investigators have seized the particular devices Ogando allegedly used, the Court is not concerned about Ogando's access to specific pieces of hardware—rather, it is his potential access to resources and his skill with

technologies enabling surreptitious criminal conduct (technologies accessible from any smartphone or laptop) that concern the Court.

These same considerations also suggest that Ogando would be able to evade the jurisdiction of this Court should he be released. Ogando's apparent access to funds, including difficult-to-trace cryptocurrencies, would make flight from prosecution easier, as would his demonstrated facility with the darknet, where Ogando "can purchase false identification and materials that could assist [him] if he were to choose to flee to avoid prosecution in this case." Gov't Opp'n at 17. Moreover, Ogando has not only means but also motive to flee from prosecution—he faces a minimum sentence of ten years in prison for his activities. The "combination of a potentially lengthy sentence plus the magnitude of the evidence against him might inspire [Ogando] to skip town rather than face the music." Languerand, 2021 WL 3674731, at *12.

To be sure, electronic location monitoring could mitigate the risk of flight, and in certain cases the Court has ordered that defendants on HISP release not use any electronic devices to access the internet. In theory, such conditions would go a long way to assuaging the government's and the Court's concerns regarding Ogando's resumption of criminal activity and/or flight. But the crucial element in HISP release is the third-party custodian—the supervising agency (and therefore the Court) must rely on the custodian to put the release conditions into practice and to ensure the defendant's compliance. As briefly noted above, however, the Court has substantial doubts about the suitability of Ogando's proffered third-party custodian, his fiancée, for this task. Ogando lived with his fiancée (then his girlfriend) for the entire course of the conspiracy; for more than two years, Ogando operated a sophisticated and lucrative drug distribution operation from

their shared residence.[7]   Suffice it to say, this record of willful ignorance (at best) towards Ogando's criminal activity does not inspire confidence in his fiancée's ability or willingness to enforce onerous conditions of release on her partner.

Accordingly, the Court concludes that this factor also supports Ogando's continued pre-trial detention: there is a real threat of the resumption of dangerous criminal activity and of flight from prosecution if Ogando is released.

<u>Conclusion</u>

In conclusion, each of the four statutory factors are either neutral or favor detention, and the Court also takes into account § 3142(e)(3)'s presumption favoring detention of defendants charged with large-scale drug distribution, a presumption which "reflects Congress's substantive judgment that [these] offenders should ordinarily be detained," <u>Stone</u>, 608 F.3d at 945.  With these considerations, the Court concludes that the government has "prove[n] by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community" if Ogando is released.  <u>Munchel</u>, 991 F.3d at 1280 (internal quotation marks and citation omitted).  Ogando would pose an "articulable threat to the community" if released, <u>id.</u> at 1282—the resumption of difficult-to-detect fentanyl distribution— and he has both motive and means (in the form of cryptocurrency and access to the darknet) to evade prosecution.  Furthermore, Ogando's ability to use technology to operate undetected, combined with the Court's doubts regarding his proposed third-party custodian's ability and willingness to ensure his compliance with potentially onerous conditions of release, suggest that

---

[7] It is also worth noting that this was not an enterprise conducted discreetly via Ogando's personal computer: the apartment searched by law enforcement in February 2021 contained duffel bags full of cash and pills and cartons full of USPS Priority Mail envelopes.  <u>See</u> Gov't Opp'n at 10–11 (pictures of the material seized in search of premises).

the risks of harm to the community and flight from prosecution cannot be sufficiently mitigated by any condition or combination of conditions.

Accordingly, upon consideration of [15] defendant Ogando's motion for reconsideration of his pretrial detention order, and the entire record herein, and for the reasons set forth above, it is hereby

**ORDERED** that the motion is **DENIED**.

**SO ORDERED**.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>May 17, 2022</u>